1

2

3

4              IN THE UNITED STATES DISTRICT COURT

5

6            FOR THE NORTHERN DISTRICT OF CALIFORNIA

7                                          No. C 08-03904 CW
  JOANNE WARWICK,
8                                          ORDER GRANTING
           Plaintiff,                      DEFENDANTS' SUMMARY
9                                          JUDGMENT MOTIONS

10      v.

11 UNIVERSITY OF THE PACIFIC; CALIFORNIA
   DEPARTMENT OF CORRECTIONS AND
12 REHABILITATION; PATRICIA MILLER;
   MATTHEW CATE; MARVIN SPEED; TED RICH;
   MICHAEL BRADY; CLAUDIA BELSHAW; JILL
13 BROWN; JOHN D. STOKES; and GARY
   SWARTHOUT,
14
           Defendants.
15 _____/

16

17      This case arises out of Plaintiff's May 31, 2005 termination

18 as a California Parole Advocacy Program (CalPAP) attorney.

19 Defendant University of the Pacific (UOP) has filed a motion for

20 summary judgment and Defendants California Department of

21 Corrections and Rehabilitation (CDCR), Patricia Miller, Matthew

22 Cate,[1] Marvin Speed, Ted Rich, Michael Brady, Claudia Belshaw, Jill

23 Brown, John D. Stokes and Gary Swarthout have filed a separate

24 motion for summary judgment.  Plaintiff Joanne Warwick opposes the

25

26      [1]Matthew Cate is the Secretary of the CDCR and was not
   appointed until May, 2008.  Although Cate was not the Secretary
27 during the relevant time period of Plaintiff's factual allegations,
   he was named as a Defendant for the limited purpose of injunctive
28 relief.

United States District Court
For the Northern District of California

1   motions.[2]  The motions were heard on April 8, 2010.  Having

2   considered oral argument and all of the papers filed by the

3   parties, the Court GRANTS Defendants' motions for summary judgment.

4                            BACKGROUND

5        The CalPAP program was created as a result of the permanent

6   injunction in <u>Valdivia v. Schwarzenegger</u>, No. Civ. S-94-0671 (E.D.

7   Cal. Mar. 9, 2004), which required the State of California to

8   establish a parole revocation attorney program.[3]  CalPAP is

9   operated by UOP through a contract with the State of California.

10  CalPAP trains, appoints and assigns panel-contracted attorneys to

11  all parolees facing parole revocation proceedings.  CalPAP

12  attorneys are paid $180 per case that they are assigned.

13       In November, 2004, Plaintiff signed an agreement with CalPAP

14  to become an at-will independently contracted CalPAP panel

15  attorney.  Case assignments as a CalPAP attorney were dependent on

16  "satisfying the conditions for admittance to correctional

17  facilities" pursuant to the applicable California regulations, such

18  as California Code of Regulations Title 15 §§ 3172.1 and 3178.

19  Fourth Amended Complaint (4AC), Exh. 1 at 1.

20       During her tenure as a CalPAP attorney, Plaintiff voiced her

21  concerns about (1) how clients were assigned to CalPAP attorneys,

22  (2) her difficulties in gaining access to San Quentin to meet with

23  ───────────────

24       [2]Plaintiff does not oppose the motion with respect to the
    claims against Patricia Miller, Michael Brady, Claudia Belshaw,

25  John Stokes and Gary Swarthout.  Therefore, the Court grants
    summary judgment in favor of those Defendants on all claims brought

26  against them.  Plaintiff opposes the motion with respect to the
    claims against Matthew Cate, Marvin Speed, Ted Rich, Jill Brown,

27  UOP and CDCR.

28       [3]The Court grants Defendant CDCR's request to take judicial
    notice of the terms of the injunction.

                                  2

her clients and (3) that Board of Parole Hearings (BPH)[4] and CDCR officials failed to comply with the law and impeded her ability to serve her parolee clients.  She claims that Defendants conspired to terminate her employment with CalPAP in retaliation for voicing several of these concerns.

For instance, in February, 2005, Plaintiff complained to a CalPAP supervising staff attorney, Andrew Walker, that, even though she was able to visit her clients in county jail, once they were transferred to San Quentin, she was not given clearance to visit them and they were reassigned to other CalPAP attorneys.  Walker wrote to Mary Swanson, the CalPAP program director, stating, "Joanne Warwick is throwing a fit b/c she is not on the Clearance List" for San Quentin.  Fuentes Decl., Exh. B(1).  Although not clear from the record, apparently San Quentin maintained a list of CalPAP attorneys who were authorized to visit the prison.  Swanson contacted Claudia Belshaw, the CDCR employee at San Quentin who acted as the liaison for the <u>Valdivia</u> Task Force, and helped arrange for Plaintiff to be added to this list.  It is also not clear from the record exactly when Plaintiff was officially added to the list, but Plaintiff believes that she was added sometime in April, 2005.  Warwick Decl., ¶ 19.[5]

In April, 2005, Plaintiff also complained to Walker about her difficulties with representing a particular parolee, Johnny Hodge.

---

[4]BPH is a division of CDCR.

[5]To the extent that the Court relied upon evidence to which Defendants objected, the objections are overruled.  The Court did not rely on any inadmissible evidence in reaching its decision.  To the extent the Court did not rely on evidence to which Defendants objected, the objections are overruled as moot.

Plaintiff represented Hodge before he was transferred to San Quentin.  When Hodge was transferred to San Quentin, Sonia Sandoval, a "prison representative,"[6] told her that he probably would be assigned to a different CalPAP attorney.  Id.  Sandoval agreed not to let any other CalPAP attorney see him because Plaintiff was originally assigned to him.  Warwick Decl. ¶ 19.

Plaintiff visited Hodge and he told her that a different CalPAP attorney had been assigned to him.  Plaintiff claims that Hodge's new attorney convinced him to accept a bad plea bargain by telling him that Plaintiff thought the plea deal was in his best interest.  Plaintiff claims that she never spoke to Hodge's new attorney about the plea deal and would never have recommended that he take such a deal.  Plaintiff was concerned that Hodge did not receive appropriate representation.  She complained to Walker.  Walker reported this incident to CalPAP Senior Staff Attorney, Paul Lacy.  Walker also notified Ted Rich, Deputy Commissioner of the BPH, about the incident.  Plaintiff continued to visit Hodge, but claims to have done so "not as a UOP/CalPAP attorney but based on her previous clearance."  Opposition at 7.  She helped Hodge file a complaint with the California State Bar against the other CalPAP attorney.  Plaintiff claims that Lacy responded angrily to her when the two discussed the bar complaint.  Warwick Decl. ¶ 26.

On May 20, 2005, Plaintiff expressed her frustrations with the CalPAP program in a nine-page letter that she faxed to BPH Executive Director Marvin Speed.  In the letter, Plaintiff wrote about "malfeasance by parole and [BPH] staff and how the Valdivia

---

[6]Ms. Sandoval's official position with CDCR and her relationship to CalPAP is not clear from the record.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

Injunction and parolee due process rights were not being respected." Warwick Decl. ¶ 28. Plaintiff named Rich, as well as many other BPH and CDCR officials, as those who were responsible for the problems with CalPAP. Warwick Decl., Exh. D. Some of her specific complaints in the letter include denial of access to her clients' files, lack of notice regarding her clients' hearings, failure of prison officials to investigate violations by prison guards and vindictive acts taken against her clients whenever they made complaints to prison officials. Plaintiff also telephoned Speed and left him a voicemail about her concerns.

Speed forwarded the voicemail to his special assistant, Ramon Lopez. Lopez wrote Speed an email describing some of the contents of the voicemail. He noted, "One disturbing bit of information from the BRR[7] is that he observed this attorney 'hug' the parolee in the hallway following a hearing, telling him that 'everything would be alright.'" Fuentes Decl., Exh. A(1). Speed forwarded Lopez's email to Mary Swanson asking her for advice on how to deal with Plaintiff's concerns raised in her letter. Speed did not mention the hug incident or Lopez's email. Swanson responded by asking Speed to fax her the letter and telling him that "we can take it from here." Id. She also told him, "You may want to advise her, in writing, that there are procedures in place for the [BPH] to hear cases and that she should follow those procedures. I can assure you that we will deal with this as swiftly as possible on our end." Id. She also asked Speed, "Is CDC going to take any action regarding her clearance into the institutions? Part of the

---

[7]BRR appears to be an acronym for a prison official, but the parties do not define it for the Court.

agreement to be a contract attorney with CalPAP is that the attorney has standing to enter the institution.  I would like to know what action CDC is planning on taking."  Id.  Speed responded, "I need to check on the CDC side.  I will get back to you on this."  Id.

On May 24, 2005, Lacy called Plaintiff to say that the "'higher-ups' at the [BPH] were not happy with [her] letter."  Warwick Decl. ¶ 29.

On May 26, 2005, Plaintiff picked up a parolee named David Frenna when he was released from San Quentin and drove him to the Ukiah parole office[8] for an initial interview with Michael Miller, his parole officer.  Mr. Miller claims that, prior to arriving for the visit, Plaintiff called him and told him that she had "paid for a motel room for parolee Frenna using her CalPAP earnings since she couldn't do much else for him."  M. Miller Decl. ¶ 4.  Mr. Miller informed his supervisor, David Romero, of this telephone call.  This information was relayed by email to CDCR Facilities Captain Patricia Miller on the morning of May 27.  Ms. Miller became concerned that "Plaintiff might have become overly-familiar with her clients."  P. Miller Decl. ¶ 5.  She was worried that such "over-familiarity could jeopardize the safety and security of an institution, e.g. an inmate might attempt to use an outsider to smuggle contraband into prison, or to carry coded messages outside of prison in order to commit crime."  Id.  Therefore, Ms. Miller telephoned Belshaw to share this information.  Ms. Miller wanted

_____

[8]The Court takes judicial notice that Ukiah is approximately 100 miles from San Quentin, a drive of approximately two hours.  Google Maps, http://maps.google.com.

United States District Court
For the Northern District of California

Belshaw to give this information to the warden "in hopes of pulling [Plaintiff's] Gate Pass Clearance." P. Miller Decl., Exh. A. Belshaw stated that she referred the information to the warden's office because only the warden of an institution can revoke a gate pass clearance. Belshaw Dep. 75:19-23.

Also on May 27, Mike Brady, a CDCR employee, sent an email to Swanson and Speed stating, "There appears to be a continuing problem with Ms. Warwick being over familiar with the parolees. There is an inquiry into her behavior, and I would suggest that you suspend giving her work pending the outcome of the inquiry. This is a very serious matter in that it seriously compromises the safety and security of the institution and the revocation process. Your cooperation would be greatly appreciated." Fuentes Decl., Exh. (D)(3). Included in Brady's email was an email from another CDCR employee, George Lehman, which stated, in relevant part, "Ted Rich tells me that Ms. Warwick picked up a parolee at the gate upon release, took him out to lunch, went with him to the parole office, made a scene by demanding gate money and then took him to a motel. I have no idea how these facts were authenticated but it sounds kinda bad. Has CalPAP severed ties with her? Has CDCR even been notified of any of the going's-on? Ted wanted to go to the Warden with this information and I told him not to unless I called him back. I want our DC's [Deputy Commissioner's] to stay out of this if possible." Id. Swanson was out of the office, but she replied to the email and told Brady that she would have Rick Heyer "handle this matter during [her] absence." Id. Rick Heyer was a senior attorney at CalPAP.

On the same day, May 27, the warden, Jill Brown, became aware

7

of Plaintiff's familiarity with parolees.  Brown recalls talking on the telephone about Plaintiff, although she can't remember whom she spoke with or at what point in the day she spoke with this individual.  Lui Decl., Brown Dep. 37:24-38:2.  Brown learned that Plaintiff "visited an inmate after his revocation proceedings had already been concluded, which was unusual given the fact that she was, according to what [Brown] was told, his CalPAP attorney, and CalPAP attorneys had contact with their clients prior to and in preparation for the revocation proceedings."  Id. at 27:6-12.  Brown was also told that Plaintiff "picked up [an] inmate at the gate, drove him to the Ukiah parole office, engaged in some discussion with the parole agent there and then subsequently accompanied or drove the parolee [sic], now parolee, to a motel in Ukiah."  Id. at 30:6-10.  With this information, Brown was "sufficiently concerned" about the safety and security of San Quentin that she decided to revoke Plaintiff's gate clearance temporarily.  Id. at 40:3.  She concluded that she had "reason to believe at that point that it was possible that [Plaintiff] used her status as a CalPAP attorney to gain access to the institution for personal reasons, and that was my concern."  Id. at 83:15-18.  At the time Brown made this decision, she did not know that CalPAP might terminate Plaintiff if Plaintiff could no longer enter San Quentin.

Later that day, Plaintiff's gate clearance was revoked.  Prior to losing her gate clearance, Plaintiff did not receive any warning that she had violated any policy, any notice that her gate clearance would be revoked or any hearing to challenge the revocation.  CDCR did not provide Plaintiff with a written

United States District Court
For the Northern District of California

1  explanation for the reason behind her gate clearance revocation

2  until March 1, 2006, long after it had been reinstated.  At that

3  time, CDCR claimed that her "visiting privileges" had been

4  suspended because she had continued to visit prisoners in her role

5  as a CalPAP attorney after the legal proceedings concerning parole

6  had concluded.  CDCR stated, "The Department considers such action

7  as an abuse of the privilege of attorney visiting and constitutes

8  good cause for a suspension of visiting privileges."  Warwick

9  Decl., Exh. O.

10      On May 30, 2005, Heyer sent a letter to Plaintiff, which

11  terminated CalPAP's contract with Plaintiff.  Warwick Decl., Exh.

12  K.  CalPAP removed Plaintiff from the panel because her gate

13  clearance was revoked.  Id.; Fuentes Decl. ¶ 6, Exh. D(5).  On July

14  22, 2005, Brown's successor, Acting Warden John Stokes, restored

15  Plaintiff's gate clearance.  After Plaintiff's San Quentin gate

16  clearance was reinstated, she contacted CalPAP and requested to be

17  placed back on the CalPAP attorney panel.  Swanson notified

18  Plaintiff that CalPAP did "not anticipate a need to contract with

19  [Plaintiff] in the future."  Warwick, Exh. H.

20      Plaintiff asserts the following claims: (1) Violation of 42

21  U.S.C. § 1983; (2) Negligent Supervision; (3) Breach of Contract;

22  (4) Intentional Interference with Prospective Economic Advantage;

23  (5) Intentional Interference with Contractual Relations;

24  (6) Negligence; and (7) Declaratory Relief.

25                          LEGAL STANDARD

26      Summary judgment is properly granted when no genuine and

27  disputed issues of material fact remain, and when, viewing the

28  evidence most favorably to the non-moving party, the movant is

United States District Court
For the Northern District of California

1    clearly entitled to prevail as a matter of law.  Fed. R. Civ. P.

2    56; Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986);

3    Eisenberg v. Ins. Co. of N. Am., 815 F.2d 1285, 1288-89 (9th Cir.

4    1987).

5         The moving party bears the burden of showing that there is no

6    material factual dispute.  Therefore, the court must regard as true

7    the opposing party's evidence, if supported by affidavits or other

8    evidentiary material.  Celotex, 477 U.S. at 324; Eisenberg, 815

9    F.2d at 1289.  The court must draw all reasonable inferences in

10   favor of the party against whom summary judgment is sought.

11   Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574,

12   587 (1986); Intel Corp. v. Hartford Accident & Indem. Co., 952 F.2d

13   1551, 1558 (9th Cir. 1991).

14        Material facts which would preclude entry of summary judgment

15   are those which, under applicable substantive law, may affect the

16   outcome of the case.  The substantive law will identify which facts

17   are material.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

18   (1986).

19        Where the moving party does not bear the burden of proof on an

20   issue at trial, the moving party may discharge its burden of

21   production by either of two methods:

22            The moving party may produce evidence negating an
             essential element of the nonmoving party's case, or,
23           after suitable discovery, the moving party may show that
             the nonmoving party does not have enough evidence of an
24           essential element of its claim or defense to carry its
             ultimate burden of persuasion at trial.
25
     Nissan Fire & Marine Ins. Co., Ltd., v. Fritz Cos., Inc., 210 F.3d
26
     1099, 1106 (9th Cir. 2000).
27
          If the moving party discharges its burden by showing an
28

10

absence of evidence to support an essential element of a claim or defense, it is not required to produce evidence showing the absence of a material fact on such issues, or to support its motion with evidence negating the non-moving party's claim.  Id.; see also Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 885 (1990); Bhan v. NME Hosps., Inc., 929 F.2d 1404, 1409 (9th Cir. 1991).  If the moving party shows an absence of evidence to support the non-moving party's case, the burden then shifts to the non-moving party to produce "specific evidence, through affidavits or admissible discovery material, to show that the dispute exists."  Bhan, 929 F.2d at 1409.

If the moving party discharges its burden by negating an essential element of the non-moving party's claim or defense, it must produce affirmative evidence of such negation.  Nissan, 210 F.3d at 1105.  If the moving party produces such evidence, the burden then shifts to the non-moving party to produce specific evidence to show that a dispute of material fact exists.  Id.

If the moving party does not meet its initial burden of production by either method, the non-moving party is under no obligation to offer any evidence in support of its opposition.  Id. This is true even though the non-moving party bears the ultimate burden of persuasion at trial.  Id. at 1107.

DISCUSSION

I.   First Cause of Action: Section 1983 Free Speech Claim

Plaintiff alleges that Defendants UOP, Rich, Speed and Cate violated § 1983 by depriving her of her constitutional First Amendment and due process rights.  Section 1983 authorizes an injured person to assert a claim for relief against a person who,

United States District Court
For the Northern District of California

acting under color of state law, violated the claimant's federally protected rights.  To state a prima facie case, the plaintiff must allege both (1) a deprivation of a federal right and (2) that the person who deprived the plaintiff of that right acted under color of state law.  See West v. Atkins, 487 U.S. 42, 48 (1988); Flagg Bros., Inc. v. Brooks, 436 U.S. 149, 155 (1978); Gomez v. Toledo, 446 U.S. 635, 640 (1980).

A.   Section 1983 Claim Against Defendants Rich and Speed

Plaintiff asserts that Rich and Speed retaliated against her for exercising her First Amendment rights.  She argues that Speed and Rich were upset by her May 20, 2005 complaint letter and plotted with Swanson to retaliate against her by "set[ting] in motion the series of events that resulted in [her] gate pass being revoked."  Opp. at 18.  Plaintiff asserts that, after she wrote this letter, Speed and Rich "began insinuating that [she] engaged in sexual relations with inmates" and that these insinuations "created the basis for the warden's decision to revoke the gate pass."  Id.

Plaintiff must be able to prove that her "expressive conduct was a substantial or motivating factor for the adverse action" taken against her.  Alpha Energy Savers, Inc. v. Hansen, 381 F.3d 917, 923 (9th Cir. 2004).  To prove this, a plaintiff can "(1) introduce evidence that the speech and adverse action were proximate in time, such that a jury could infer that the action took place in retaliation for the speech; (2) introduce evidence that the employer expressed opposition to the speech; or (3) introduce evidence that the proffered explanations for the adverse action were false and pretextual."  Anthoine v. North

12

1   <u>Central Counties Consortium</u>, 605 F.3d 740, 750 (9th Cir. 2010)

2   (citing <u>Coszalter v. City of Salem</u>, 320 F.3d 968, 975 (9th Cir.

3   2003).   Plaintiff relies on the first and third prongs.

4        Plaintiff has provided evidence of a close temporal link.   Her

5   May 20, 2005 letter to the BPH Executive Director, Speed, described

6   due process violations, a lack of enforcement of the <u>Valdivia</u>

7   injunction, and concerns with Defendant Rich, among other BPH and

8   CDCR employees.   Her gate clearance was revoked on May 27, 2005.

9        However, "'[w]hether an adverse employment action is intended

10  to be retaliatory is a question of fact that must be decided in the

11  light of the timing <u>and</u> the surrounding circumstances.'"   <u>Anthoine</u>,

12  2010 WL 2026040, at *7 (quoting <u>Coszalter</u>, 320 F.3d at 977)

13  (emphasis added).   The surrounding circumstances establish that

14  Speed and Rich did not have any involvement in revoking Plaintiff's

15  gate clearance, and Plaintiff presents no evidence that they did.

16  Further, there is no evidence that the proffered explanations for

17  the adverse action were false or pretextual.

18       There is also no evidence that Rich knew about Plaintiff's

19  May, 2005 complaint letter.   There is no evidence that Speed or

20  Rich insinuated to the warden, or anybody else, that Plaintiff

21  engaged in "sexual relations" with parolees.   In fact, there is no

22  evidence that Speed or Rich told the warden anything about

23  Plaintiff.   There is no evidence that Speed or Rich had any

24  authority to revoke Plaintiff's gate clearance, took part in the

25  decision to revoke Plaintiff's gate clearance or asked Brown to

26  revoke Plaintiff's gate clearance.   In short, there is no evidence

27  that Speed or Rich "set in a motion a series of events" that led to

28  Plaintiff's gate clearance being revoked in retaliation for her

exercising her First Amendment rights.[9]   Therefore, the Court

grants Speed and Rich summary judgment on the § 1983 claims

asserted against them.[10]

       B.   Section 1983 Claim Against Cate

       Defendant Cate is sued in his official capacity as the

Secretary of CDCR.   In this position, Cate is responsible for the

policies, practices and customs of CDCR.   Because the Court

concludes that there is no evidence that Rich, Speed or Brown

revoked Plaintiff's gate clearance in retaliation for her protected

speech, Cate is not liable for CDCR policies, practices and customs

related to any alleged retaliatory clearance revocation.

       C.   Section 1983 Claim Against Defendant UOP

       Normally, private entities like UOP are not liable under

§ 1983 because the statute imposes limitations only on state action

under color of state law and does not reach the conduct of private

parties.   Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n,

531 U.S. 288, 295 (2001).   However, Plaintiff claims that UOP is

liable under § 1983 because it conspired with state actors.

       As noted above, there is no evidence that any state actors

violated Plaintiff's constitutional rights.   Even if such evidence

exists, Plaintiff's § 1983 claim against UOP fails because there

is no evidence of a conspiracy between UOP and state actors to

_____

       [9]There is also no evidence that Brown, on her own accord,
revoked Plaintiff's gate clearance in retaliation for exercising
her First Amendment rights.

       [10]Because the Court concludes that Plaintiff's gate clearance
was not revoked in retaliation for exercising her First Amendment
rights, it need not address the parties' arguments concerning
whether she was a public employee or whether Garcetti v. Ceballos,
547 U.S. 410 (2006), applies.

United States District Court
For the Northern District of California

violate her constitutional rights.

An agreement or conspiracy between a government actor and a private party is sufficient to satisfy the state action test.  See Dennis v. Sparks, 449 U.S. 24, 29 (1980) (private individual jointly acting with state officials may be engaged in conspiracy and acting "under color of state law").  Establishing liability for a conspiracy between a private actor and a state actor is no different from establishing liability for a conspiracy between two state actors.  Franklin v. Fox, 312 F.3d 423, 441 (9th Cir. 2002). The plaintiff must show "an agreement or meeting of the minds to violate constitutional rights."  Id.  "To be liable, each participant in the conspiracy need not know the exact details of the plan, but each participant must at least share the common objective of the conspiracy."  Id. (internal quotation marks omitted).

Plaintiff's evidence falls short of this standard.  Plaintiff claims that Mary Swanson, the CalPAP program director, and Speed, the executive director of the BPH, agreed to fabricate a reason to terminate Plaintiff.  Swanson knew that Plaintiff needed a valid San Quentin gate clearance in order to maintain eligibility as a CalPAP attorney.  Plaintiff asserts that, once Swanson learned that Plaintiff made a complaint to Speed about the CDCR, all Swanson had to do was tell Speed that revocation of the San Quentin gate clearance would essentially terminate Plaintiff's contract as a CalPAP attorney.  Thus, Plaintiff simply points to the May 20 email in which Swanson notified Speed that part of the agreement to be a contract attorney with CalPAP was that each attorney needed clearance to enter a prison.  Fuentes Decl., Exh.

A(1). Swanson asked, "I would like to know what action CDC is planning on taking," and Speed replied, "I need to check on the CDC side." Id. Plaintiff has not presented any evidence that Speed followed up on this. Plaintiff argues that, had "Ms. Swanson never told defendant Speed that pulling Ms. Warwick's gate pass would be cause for termination, the strong likelihood is that defendants Speed and Rich would never have engaged in their rumor campaign, and Ms. Warwick would still be a UOP/CalPAP attorney . . . ."

However, the fact that Swanson told Speed about the effect of revoking a gate clearance is not sufficient to raise an inference that Swanson and Speed had an agreement to terminate Plaintiff in retaliation for complaining about UOP, CalPAP, CDCR or BPH. Moreover, there is no evidence that Speed or Swanson discussed the matter with Brown, or with anyone who influenced Brown's decision to revoke Plaintiff's gate clearance. Further, because Plaintiff was an at-will independent contractor, UOP did not need to create a "cause" to remove her from the CalPAP panel of attorneys.

Because Plaintiff has not presented any evidence of a conspiracy between UOP and any state actors, Plaintiff's § 1983 claim against UOP fails.[11]

---

[11]Plaintiff asserts a § 1983 claim against Defendant UOP under the theory that its employees violated her constitutional rights. The Ninth Circuit has not addressed whether a plaintiff can pursue § 1983 claims against a private entity under a respondeat superior theory of liability. However, the law is clear that government entities may not be held vicariously liable for the unconstitutional acts of their employees under the theory of respondeat superior. See Board of County Comm'rs v. Brown, 520 U.S. 397, 403 (1997); Monell v. Dept. of Social Services of the City of N.Y., 436 U.S. 658, 691 (1978); Fuller v. City of Oakland, (continued...)

United States District Court
For the Northern District of California

**D.   Due Process Claims**

Plaintiff argues that she has a cause of action against CDCR Defendants for violation of her due process rights which survives summary judgment because CDCR Defendants did not properly move on this cause of action.   However, Plaintiff's operative complaint fails even to plead a due process claim.   The only constitutional violation that Plaintiff alleges is a violation of her free speech rights under the First Amendment.   Although Plaintiff's complaint includes the words "due process" in passing, it does not put State Defendants on notice that Plaintiff is alleging this type of claim. Plaintiff's complaint does not even identify the particular property interest at issue that is allegedly protected by the Constitution.   Because Plaintiff's allegations are couched in terms of a retaliation claim, not a due process claim, Plaintiff may not assert a due process claim at this late stage in the litigation.

Even if Plaintiff could assert a due process claim, she has not established that she had a property interest in her San Quentin

---

[11](...continued)
47 F.3d 1522, 1534 (9th Cir. 1995).  Many other circuits, as well as several district courts in the Ninth Circuit, have concluded that a private entity is liable under § 1983 only when its official policy or custom causes a deprivation of constitutional rights. See e.g., Dubbs v. Head Start, Inc., 336 F.3d 1194, 1216 (10th Cir. 2003); Jackson v. Illinois Medi-Car, Inc., 300 F.3d 760, 766 (7th Cir. 2002); Burke v. North Dakota Department of Corrections and Rehabilitation, 294 F.3d 1043, 1044 (9th Cir. 2002); Austin v. Paramount Parks, Inc., 195 F.3d 715, 729 (4th Cir. 1999); Harvey v. Harvey, 949 F.2d 1127, 1129-30 (11th Cir. 1992); Rojas v. Alexander's Dep't Store, 924 F.2d 406, 408-09 (2d Cir. 1990); Carrea v. California, 2009 WL 1770130, *8 (C.D. Cal.); Brown v. Carnevale, 2008 WL 4570342, *5 (D. Or.); Tater-Alexander v. Amerjan, 2008 WL 961233, *12 (E.D. Cal.).  Plaintiff has not presented any evidence that UOP maintained an official policy or custom that caused a deprivation of her constitutional rights.  For this additional reason, the Court concludes that Plaintiff's § 1983 claim against UOP fails.

17

gate clearance and was entitled to notice of revocation, a hearing and an appeal.  The California regulation cited by Plaintiff, 15 California Code of Regulations § 3178, generally describes the rules for attorney visits and consultations.  It does not confer a right for an attorney to receive a prison gate clearance.

Similarly, it is not clear that the regulations that set forth the procedures for excluding individuals from a prison confer a constitutionally protected property interest.  The Ninth Circuit has held that "a substantive property right cannot exist exclusively by virtue of a procedural right." <u>Dorr v. County of Butte</u>, 795 F.2d 875, 877 (9th Cir. 1986).  Thus, "while state law may create an interest in having officials adhere to state procedures, those procedures alone do not give rise to a 'legitimate claim of entitlement' that is subject to the protections of the federal due process clause." <u>Federal Deposit Ins. Corp. v. Henderson</u>, 940 F.2d 465, 475 (9th Cir. 1991) (quoting <u>Memphis Light, Gas & Water v. Craft</u>, 436 U.S. 1, 9 (1978)).  Moreover, Plaintiff's gate clearance was suspended on an emergency basis with no opportunity for a notice or a hearing; and it was reinstated within sixty days.  Accordingly, Plaintiff's allegation that she has a constitutionally protected interest in a prison gate clearance and thus in the state prison procedures is unsupported.

II.  State Law Immunities

State Defendants argue that Plaintiff's tort claims are barred under various sections of the California Government Claims Act.  Section 821 provides that a "public employee is not liable for an injury caused by his adoption of or failure to adopt an enactment or by his failure to enforce an enactment." Cal. Gov't Code § 820.

Section 821.2 states that a public employee is not liable for denying or revoking a permit, approval, or similar authorization. Section 820.2 states that a public employee is not liable for discretionary acts "whether or not such discretion be abused." CDCR, as a public entity, also enjoys similar immunities. See Cal. Gov't Code § 818.2 (not liable for an injury caused by failing to enforce any law), § 818.4 (not liable for revoking any permit or "similar authorization"), § 818.8 (not liable for misrepresentations by its employees "whether or not such misrepresentations be negligent or intentional"). Because of these immunities, State Defendants -- CDCR, Rich, Speed and Brown -- cannot be held liable in tort for the revocation of Plaintiff's San Quentin gate clearance.

However, even if State Defendants were not immune, Plaintiff's state tort claims would fail.

III. Second and Sixth Causes of Action:  Negligent Supervision Claims and Negligence Respectively

Plaintiff alleges negligent supervision and negligence claims against CDCR and Brown.  Plaintiff alleges that CDCR supervisors engaged in acts of negligent supervision by failing properly to train their employees on the enforcement of California's prison visitation laws.  Plaintiff also alleges that CDCR Defendants failed to protect her from having her gate clearance revoked and therefore being terminated as a CalPAP attorney.  Specifically, Plaintiff alleges that CDCR Defendants misinterpreted and misapplied the following regulations:  Cal. Code of Regs. tit. 15, §§ 3172.1 (Approval/Disapproval of Prospective Visitors), 3176 (Denial, Restriction, Suspension, Termination or Revocation of

Visits and Exclusion of a Person), 3176.1 (Visitor Violation Process), 3176.3 (Exclusion of a Person from Institutions/ Facilities), 3178 (Attorney Visitations and Consultation), and 3179 (Appeals Relating to Visiting).  However, California courts do not impose negligence liability on an agency for failing to follow its regulations.  Desert Healthcare Dist. v. PacifiCare FHP, Inc., 94 Cal. App. 4th 781, 793 (2001) ("a negligence duty cannot be derived from an administrative regulation.").  Therefore, Plaintiff's negligent supervision and negligence claims against CDCR Defendants for improperly revoking a prison gate clearance based on CDCR's own regulations fail.

IV.  Third Cause of Action: Breach of Contract

Plaintiff alleges a breach of contract claim against UOP.  She also alleges that UOP breached the implied covenant of good faith and fair dealing by cutting her caseload and by terminating her for complaining about the CalPAP program.  To prevail on a breach of contract claim, Plaintiff must establish four elements: "(1) the existence of a valid contract; (2) Plaintiff's performance or excuse for nonperformance; (3) Defendant's unjustified or unexcused failure to perform; and (4) damage to Plaintiff." Lincoln Nat'l Corp. v. TakeCare, Inc., 1998 WL 281290, *3 (N.D. Cal.); see also First Commercial Mortgage Co. v. Reece, 89 Cal. App. 4th 731, 745 (2001).

The terms of Plaintiff's agreement with UOP to become a CalPAP panel attorney do not guarantee Plaintiff any set amount of parolee clients.  The agreement states, "CalPAP will assign cases to panel attorneys at its sole discretion, and inclusion in the panel attorney list is not a guarantee of case assignment." (emphasis

added).   Under the agreement, CalPAP had complete discretion to assign no cases to Plaintiff.

UOP argues that it did not have any obligation to give Plaintiff a hearing before she was removed from the attorney list because the agreement states that "CalPAP panel attorneys serve on the panel at-will."  The agreement further states, "Either CalPAP or the individual attorney may remove the attorney's name from the panel attorney list at any time, provided that written notice is given to the other party."  Plaintiff does not contest that she was given written notice of her termination.   Rather, Plaintiff asserts that UOP breached the contract when it conspired with CDCR to revoke her gate clearance, because she needed a gate clearance to carry out her duties.   Because the Court concludes that Plaintiff's evidence does not support such a conspiracy, her breach of contract and breach of the implied covenant of good faith and fair dealing claims fail.

V.   Fourth Cause of Action: Intentional Interference with Prospective Economic Advantage

Plaintiff alleges intentional interference with prospective economic advantage (IIPEA) against CDCR Defendants.

To state a claim for the tort of IIPEA, Plaintiff must show, for each Defendant: (1) an economic relationship between Plaintiff and a third party containing the probability for future economic benefit for Plaintiff; (2) Defendant's knowledge of this relationship; (3) intentional acts by Defendant designed to disrupt the relationship; (4) actual disruption of the relationship; (5) damages proximately caused by Defendant's acts; and (6) that Defendant's acts were wrongful by some legal measure other than the

United States District Court
For the Northern District of California

1  fact of the interference itself.  <u>Korea Supply Co. v. Lockheed</u>

2  <u>Martin Corp.</u>, 29 Cal. 4th 1134, 1153-54 (2003).

3      "California law has long recognized that the core of

4  intentional interference business torts is interference with an

5  economic relationship by a third-party stranger to that

6  relationship, so that an entity with a direct interest or

7  involvement in that relationship is not usually liable for harm

8  caused by pursuit of its interests."  <u>Marin Tug & Barge, Inc. v.</u>

9  <u>Westport Petroleum, Inc.</u>, 271 F.3d 825 (9th Cir. 2001).  <u>See also</u>,

10  <u>ViChip Corp. v. Lee</u>, 438 F. Supp. 2d 1087, 1097 (N.D. Cal. 2006)

11  ("[T]he core of intentional interference business torts is

12  interference with an economic relationship by a third-party

13  stranger to that relationship").

14      Here, CDCR Defendants are not "strangers" or "interlopers"

15  regarding Plaintiff's duties under the CalPAP contract.  The CDCR

16  contracted with UOP to create and run CalPAP to provide parolees

17  with legal representation because the <u>Valdivia</u> injunction required

18  CDCR to provide for such representation.  CalPAP attorneys are

19  retained solely to perform work involving the CDCR and the CDCR

20  could choose not to renew its contract with CalPAP if the CDCR

21  became dissatisfied with the performance of CalPAP's attorneys.

22  Thus, CDCR had a direct, continuing and substantial interest in the

23  performance of CalPAP attorneys.  CDCR Defendants are not

24  "strangers" or "interlopers" subject to an IIEPA claim.

25  VI.  Fifth Cause of Action: Intentional Interference with
          Contractual Relations

26

27      Plaintiff alleges intentional interference with contractual

28  relations (IICR) against CDCR Defendants.

                              22

**United States District Court**
For the Northern District of California

1    Plaintiff admits that her contract to serve as a CalPAP panel

2 attorney was at-will.  Under California law, a party who interferes

3 with an at-will contract cannot be sued for interference with

4 contract.  <u>Lovesy v. Armed Forces Benefits Ass'n</u>, 2008 WL 696991,

5 at *11 (N.D. Cal.) ("[A]s a matter of law, a claim for interference

6 with contract is improper if the contract is 'at will.'").  Any

7 such claim is more properly viewed as an interference with a

8 prospective economic advantage.  <u>Reeves v. Hanlon</u>, 33 Cal. 4th

9 1140, 1152 (2004).

10 VII.   Seventh Cause of Action: Declaratory Judgment

11    Plaintiff requests a declaratory judgment that she will not

12 have to explain the May, 2005 gate clearance revocation as would be

13 required by Cal. Code Regs. tit. 15 § 3178(d).[12]  Such declaratory

14 relief is not appropriate because this order summarily adjudicates

15 all claims in favor of Defendants.  Therefore, there is no present

16 and actual controversy between the parties.

17 //

18 //

19 //

20 //

21 //

22 //

23 //

24 //

25

26    [12]Cal. Code Regs. tit. 15 § 3178(d) provides in relevant part,
"An attorney who wishes to consult in person with an inmate shall
27 contact the institution/facility at which the inmate is housed. . .
. Requesting attorneys must . . . explain any prior suspension or
28 exclusion from a correctional facility . . . ."

1

CONCLUSION

2     For the foregoing reasons, the Court GRANTS CDCR Defendants'

3 motion for summary judgment (Docket No. 127) and GRANTS UOP's

4 motion for summary judgment (Docket No. 128).  The clerk shall

5 enter judgment in favor of Defendants and Plaintiff shall bear

6 Defendants' costs.

7     IT IS SO ORDERED.

8 Dated: 07/06/10                 _____
                                  CLAUDIA WILKEN
9                                 United States District Judge

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28